IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 13, 2013 Session

IN RE TRAVION B. ET AL.

Appeal from the Juvenile Court for Knox County
No. 73540      Timothy Irwin, Judge

No. E2012-01673-COA-R3-PT-FILED-AUGUST 19, 2013

This is a termination of parental rights case focusing on Travion B. and Davion B., the minor children ("Children") of Samantha B. ("Mother"). The Children were taken into protective custody by the Tennessee Department of Children's Services ("DCS") on January 24, 2011, after the younger child suffered a head injury. On October 6, 2011, DCS filed a petition to terminate the parental rights of Mother. Following a bench trial spanning four days, the trial court granted the petition upon its finding, by clear and convincing evidence, that Mother had committed severe child abuse. The court further found, by clear and convincing evidence, that termination of Mother's parental rights was in the Children's best interest.[1] Mother has appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Ben H. Houston, II, Knoxville, Tennessee, for the appellant, Samantha B.

Robert E. Cooper, Jr., Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1] According to the petition for termination of Mother's parental rights, Travion and Davion had different fathers whose identities were confirmed by paternity testing. DCS sought termination of the fathers' respective parental rights through proceedings independent of this action.

**OPINION**

## I. Factual and Procedural Background

The injury giving rise to the allegation of severe child abuse in this action became apparent when Davion, who was six months old, was transported by ambulance to East Tennessee Children's Hospital in the early morning hours of January 22, 2011. Davion was diagnosed with a subdural hematoma and bilateral retinal hemorrhages. His treating pediatrician, Dr. Marymer Perales, testified at the trial that these injuries were indicative of inflicted trauma, specifically by rotation or acceleration/deceleration forces inflicted by shaking. The older child, Travion, was sixteen months old at the time and was not alleged to have suffered abusive injury.

Mother was sixteen years old when Travion was born and seventeen upon Davion's birth. At the time of Davion's injury, Mother and the Children had been residing with Mother's friend, D.B., for two to three weeks in D.B.'s apartment. Also living in the home were D.B.'s two children and her mother, M.C. Mother and the Children slept together in the one bed in Mother's bedroom. D.B. and her two children occupied the other bedroom while M.C. slept on the couch in the living room.

On January 22, 2011, Davion awoke crying at approximately 2:00 a.m. Mother testified that she tried to comfort Davion for approximately ten minutes before he "shivered" for about five seconds and then threw his head back with his eyes rolling back in his head. Mother said she placed Davion on the carpeted floor to protect his neck and went into D.B.'s room to awaken her for help. As Mother explained, she picked up Travion, who was sleeping, and carried him as she went to D.B. for assistance. D.B. and M.C. both indicated at trial that Mother had neither child in her arms when she went to D.B.'s room.

Mother and D.B. came back into Mother's room where Davion remained on the floor. Testimony differed as to whether D.B. picked up Davion and attempted to rouse him when Mother and she returned to Mother's room. At some point M.C. entered the room, picked up Davion, and attempted to rouse him. D.B., at Mother's request, called 911 to summon emergency medical responders. Mother testified at the trial that thirty to forty-five minutes passed between the time Davion's crying awakened her and the call to 911 was made. She admitted telling investigators on January 22, 2011, that only four or five minutes elapsed before she asked D.B. to call 911. Davion was transported by ambulance to East Tennessee Children's Hospital.

The Children were placed in the emergency protective care of DCS on January 22, 2011. The trial court entered a protective custody order on January 24, 2011. On October

6, 2011, DCS filed a petition to terminate the parental rights of Mother as to the Children. Following a bench trial held over four non-consecutive days beginning March 8, 2012, and concluding August 2, 2012, the trial court found by clear and convincing evidence that Mother had committed severe child abuse against Davion and that it was in the best interest of the Children to terminate Mother's parental rights. The trial court entered its final decree on January 2, 2013. Mother timely appealed.

## II. Issues Presented

On appeal, Mother presents two issues, which we have restated as follows:

1.      Whether the trial court erred by finding clear and convincing evidence that Mother had committed severe child abuse and by terminating Mother's parental rights based on that ground pursuant to Tennessee Code Annotated §§ 37-1-102(b)(23)(A) and 36-1-113(g)(4).

2.      Whether the trial court erred by finding clear and convincing evidence that it was in the Children's best interest to terminate Mother's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36–1–113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36–1–113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

## IV. Severe Child Abuse

The trial court terminated Mother's parental rights on the statutory ground that she committed severe child abuse. Tennessee Code Annotated § 36-1-113(g)(4) (Supp. 2012), as relevant to this action, provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

* * *

(4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of

-4-

such child, or any other child residing temporarily or permanently in the home of such parent or guardian . . . .

Tennessee Code Annotated § 37-1-102(b)(23) (Supp. 2012) defines "severe child abuse," in relevant part, as:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death . . . .

As this Court has previously explained:

a parent's conduct is "knowing, and a parent acts or fails to act 'knowingly,' when . . . she has actual knowledge of the relevant facts and circumstances or when . . . she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to . . . her."

*In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009) (quoting *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122 at *7 (Tenn. Ct. App. July 13, 2004)).

In its order terminating Mother's parental rights, the trial court summarized its findings of fact regarding severe child abuse as follows:

The Court is persuaded by the testimony from Dr. Perales that the incident causing this child's injuries occurred at the time the mother and her two small children were alone in the bedroom, shortly before 911 was called. The child suffered a subdural hematoma and severe retinal hemorrhages. Those findings and the lack of obvious external trauma points to shaking as the cause of this child's injuries. The injuries were not self-inflicted, not inflicted by the then-16-month-old brother, and did not occur during the normal course of child care. The court finds, by clear and convincing evidence, that [Mother] caused Davion's injuries.

Mother offered no explanation at all for the child's injuries, other than a fall from a low couch onto a carpeted floor, and the child hitting his head on the tub. Her story was inconsistent, in many respects, from initial interviews to her testimony in Court. (Whether she went to D.B.'s room, or screamed for D.B. to come to [Mother's] room; the length of time for the mother to call 911 (4-5 minutes vs. 30-45 minutes); where mom was when Travion pulled Davion

off the couch, on the couch next to Davion, or in the love seat across from Davion; whether mom was even in the room when it happened; whether Davion cried or did not cry when pulled off the couch; whether or not others cared for Davion at all; when others cared for Davion (the day before, the week before, or two weeks before the incident; and whether Davion hit his head on a ceramic bathtub as opposed to a plastic baby tub, to name a few.)

Dr. Perales ruled out the fall and the tub incident as possible causes of the child's injuries by stating that this injury was not caused by the child himself or by a child of the same age as this child's older brother, and by opining that this was inflicted, not accidental trauma. Mother placed herself alone with the child at the time the child became symptomatic. She indicated that, on two separate occasions, others had cared for her child, contrary to her first assertions to law enforcement and DCS. However her recollection of when those incidents occurred was very vague – they could have happened the day before and the week before the incident, or they could have happened the week before and two weeks before the incident. In any case, mother denied that Davion appeared in any way to be acting significantly differently after being cared for by others. She also denied that the child acted significantly differently after the fall and the bathtub incident. She had no concern significant enough to lead her to believe that Davion should see the doctor after either the fall or the bathtub incident, or after others cared for Davion. She had no reason to believe that he was injured significantly while in the care of others. This Court also has no reason to so believe.

The Court considers it odd that [Mother] would leave Davion, in obvious distress, on the floor, and take the well child, Travion, with her to get help from [D.B.].

The Court has known [Mother] for a long time, and is surprised to come to the conclusion that she could have hurt her child. However, the testimony of [M.C.], reluctantly given, that the mother threatened to throw the baby against the wall if he does not stop crying, together with the other facts, leads the Court to the conclusion that she did become frustrated and did something to Davion to cause his injuries. This conclusion is supported by [D.B.'s] testimony that she heard, that night, Davion crying and then stop. This Court did give much credibility to the testimony of [D.B.] and [M.C.], but the Court

does [sic]<sup>2</sup> believe their testimony regarding the statements of the mother, and that the child stopped crying.

[Mother] has had ample opportunity to acknowledge what this Court has found, that she injured her child, and has had ample opportunity to take advantage of mental health counseling to address the underlying issues leading her to such actions. She, however, has failed to do so.

Based on the totality of the testimony, the trial court determined that the statutory ground of severe child abuse had been proven by clear and convincing evidence. Mother contends that the trial court erred in this finding because the court's reliance on Dr. Perales's testimony was misplaced according to recent developments in the medical research surrounding injuries caused by rotation or acceleration/deceleration trauma, commonly known as shaken baby syndrome. We disagree.

Dr. Perales testified that she is a child abuse pediatrician at East Tennessee Children's Hospital and that she treated Davion in the emergency room on January 22, 2011, as well as throughout his hospitalization. She said that a computerized axial tomography ("CT") scan performed upon Davion's admission revealed a left-sided subdural hematoma. She explained that a subdural hematoma is "blood in the area between the dura and arachnoid . . . but between two layers of the area between the brain and the scalp that is not a space that is necessarily always there, it's just a potential space where blood vessels go through." According to Dr. Perales, it is abnormal to find a subdural hematoma in a child, and trauma is a likely cause. She explained that on January 22, the subdural hematoma was acute, indicating that it was recent. The subdural hematoma had become subacute by the time a second CT scan was performed on January 24, 2011. Dr. Perales testified that there is usually a seventy-two hour window during which an acute subdural hematoma may resolve itself and become subacute. Based on everything she knew about Davion, Dr. Perales opined that his head injury occurred when he became symptomatic, which event was described by Mother as happening in the middle of the night a few hours before his hospitalization on January 22, 2011.

Dr. Perales had previously treated Davion during a September 2010 hospitalization when he was diagnosed with bronchiolitis. She consulted with a neurologist at that time because Davion presented "high tone, or stiffness and jerkiness in his joints." She testified that it was possible Davion sustained an injury to the brain prior to being treated in

<hr>

<sup>2</sup>In its ruling from the bench, the trial court stated about D.B. and M.C.: "I didn't find those two witnesses very credible . . . . But there's no reason to believe that they were lying when they said the crying stopped."

September 2010. She was certain, however, that he did not have a subdural hematoma at that time because the CT scan taken during the 2010 admission did not indicate one. During the January 2011 admission, Dr. Perales observed that Davion's tone was significantly lower. She opined that this reduction in tone may have been due to the head injury, as she would expect "low tone" in a child with such a condition.

Upon Davion's January 22, 2011 admission, Dr. Perales requested an ophthalmology consultation, which revealed that Davion had bilateral retinal hemorrhages in multiple layers and multiple quadrants of the eyes, indicating a greater likelihood of inflicted trauma. Dr. Perales maintained that Davion's injuries were consistent with injuries caused by rotation or acceleration/deceleration. She opined that the injuries had been sustained by Davion within twenty-four hours of his hospitalization and that the injuries could not have been self-inflicted or inflicted by a sixteen-month-old child such as Davion's brother. Instead, she said there were two possibilities for how trauma could have resulted in Davion's injuries, one was by direct impact and the other by rotational or acceleration/deceleration forces. She found no sign of direct impact in this case, concluding that rotational or acceleration/deceleration forces had caused the injury.

Dr. Perales considered the radiologist's report when she reached her conclusion regarding Davion's injuries. She said the radiologist believed there could have been a previous subdural hematoma and that the blood from the new hematoma was mixing with the prior injury. Dr. Perales explained that infants with subdural hematomas will sometimes form protective membranes around the bleeds. According to Dr. Perales, research exists suggesting that membrane formation could be a reason for some infants' hematomas healing more slowly than others. When asked if an "old brain bleed" could have "rebled causing the subdural hematoma," Dr. Perales answered:

> I guess in theory it could, the – if you read through my consult, though, as I took everything into consideration, I don't believe I ever wrote that I felt that there was an old bleed there. I do acknowledge that from the first CT to the second CT there was increased space, but give into account that the previous CTs were normal, it's not what I felt the process was. Or the progression was.

Dr. Perales further explained that subdural hematomas in infants can be asymptomatic. She noted that the subdural hematomas that are not so large as to require surgical evacuation usually heal on their own. When questioned regarding the principle of "rebleeding," she said the research regarding rebleeding has focused primarily on geriatric patients who would sometimes reinjure a healing subdural hematoma and experience rebleeding as a result. She noted there was some application of this research to hydrocephalic babies, or those with fluid

on the brain, but that the research had not been applied to babies who suffered subdural hematomas during the birth process.

During the trial, Mother denied ever shaking Davion. She recounted two incidents occurring approximately a week before his hospitalization that she believed could have caused his injury. The first was a fall from the couch in the apartment when Travion pulled Davion onto the floor by his bib. The second was a self-inflicted impact against the side of a bathtub when Davion flung back his head while she was giving him a bath. Mother's testimony was unclear as to exactly when these incidents occurred, although she acknowledged telling investigators in January 2011 that the bathtub incident occurred on Tuesday, January 18. She initially testified at trial that the bathtub was a regular ceramic tub but later acknowledged having told investigators in January 2011 that it was a plastic tub.

Mother further testified that Davion had been cared for by someone other than herself twice during the week before the injury. The first occasion was approximately a week before Davion was hospitalized. Mother and D.B. had gone to a club together, with Mother leaving Davion in the care of her best friend's sister for about four hours. The second occasion was during the afternoon of January 21, 2011, when Mother drove with the Children's maternal grandmother to purchase diapers and make a car payment, leaving Davion in D.B.'s care for about forty-five minutes. D.B. testified that she remembered Mother leaving to make the car payment that day but did not recall if she provided care for Davion while Mother was gone. M.C. testified that she was present at the apartment on January 21, 2011. She remembered D.B. caring for Davion while Mother left with the maternal grandmother. Mother at one point testified that she thought this trip with the maternal grandmother could have been the previous Friday, specifically January 14.

Mother presented no expert witness at the trial. On appeal, Mother cites three authorities to support her assertion that recent developments in medical research should lead us to question Dr. Perales's testimony regarding the cause of Davion's injury. The first is a 2010 United States Supreme Court dissenting opinion in which a three-justice minority explained that recent medical research questioned whether in the first year of an infant's life, the effects of shaken baby syndrome could be mimicked by the opening and rebleeding, upon minimal impact, of small subdural hematomas that were the natural result of the birth process. *See Cavozos v. Smith*, 132 S.Ct. 2, 11 (2011) (Ginsburg, J., dissenting) (opposing the majority's holding that evidence was sufficient to uphold the jury's finding that the victim died from shaken baby syndrome and subsequent criminal verdict against the defendant).

The second authority Mother cites is a published opinion from a state intermediate appellate court in Wisconsin in which a criminal defendant convicted of first degree reckless homicide was granted a new trial, based on newly discovered evidence in the form of

research developments surrounding shaken baby syndrome. *See State v. Edmunds*, 746 N.W.2d 590, 592-94, 599 (Wis. Ct. App. 2008). The third authority is a 2009 Washington University Law Review article examining medical research that questions the "diagnostic triad" of "retinal bleeding, bleeding in the protective layer of the brain, and brain swelling" as sufficient grounds for a court to make a criminal determination of child abuse by shaken baby syndrome. *See* Deborah Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts*, 87 Wash. U.L. Rev. 1, 58 (2009).

These authorities upon which Mother relies in support of her position do not constitute controlling authority for Tennessee courts. *See, e.g.*, *Culbreath v. First Tenn. Bank Nat'l Assoc.*, 44 S.W.3d 518, 526-27 (Tenn. 2001) (determining that cases from other jurisdictions and law review articles cited by the appellee were inapposite where other authorities controlled); *Brooks Cotton Co., Inc. v. Williams*, 381 S.W.3d 414, 422 (Tenn. Ct. App. 2012) (consulting a treatise on contract law and an Alabama Supreme Court decision as persuasive but not controlling authority). As these authorities undertake a review of developments in medical research in the context of criminal law, we determine such to be inapplicable to the case at bar.

At trial, the parties stipulated that Dr. Perales was a child abuse pediatric expert. Dr. Perales personally examined and treated Davion before and after he was diagnosed with a subdural hematoma on January 22, 2011. Mother's counsel cross-examined Dr. Perales regarding the possibility that Davion could have suffered reopening of earlier hematomas, or "bleeds," and regarding Dr. Perales's interpretation of the radiologist's report that offered the possibility that blood from a "rebleed" was present on the January 2011 CT scans. Dr. Perales also testified as to the effect of developing medical research on her opinion of how Davion was injured. Her ultimate opinion to a reasonable degree of medical certainty was that Davion suffered an inflicted trauma at the time he became symptomatic, identified by Mother's testimony as when the Children were alone with Mother in Mother's room. Dr. Perales specifically opined that Davion's injury could not have been inflicted by a sixteen-month-old child, by Davion himself, or in the course of providing routine child care. We determine that the trial court did not err in relying on Dr. Perales's expert testimony.

Mother also contends that the trial court erred in finding severe child abuse because two adults besides Mother, D.B. and M.C., had access to Davion during the twenty-four hours before he was hospitalized. As the trial court noted, Mother's testimony regarding when she left Davion with other caretakers was vague and contradictory in relation to what she initially told investigators. Mother admitted at trial that she first told DCS Investigator Vickie Fox she had never left her children in anyone else's care. She indicated she also told Knoxville Police Detective Damewood she had never left the Children with anyone because she "didn't want to get looked at as a bad parent for leaving them."

Mother subsequently testified that she had left Davion with another caretaker twice, once with D.B. while she bought diapers at Walgreen's with the Children's maternal grandmother and upon a separate occasion when she and D.B. attended a club. Regarding the diaper-buying errand, Mother said she thought the trip to Walgreen's occurred during the day on Friday, January 21, 2011, but she was unsure of the day. When asked if she would agree with what she initially told a DCS investigator, that the journey to Walgreen's was a week before Davion's hospitalization, she answered in the affirmative. She said that D.B. called her once during the Walgreen's trip to report that Davion was crying and that she told D.B. she would be home immediately.

Both D.B. and M.C. testified at the trial that Mother left the apartment once for a short time with the Children's maternal grandmother on January 21, 2011. When asked if she provided cared for Davion while Mother was gone, D.B. was evasive, saying, "I might've. I'm not going to say I didn't and I'm not going to say I did for sure because it's been a long time ago." M.C., however, testified that D.B. did render care for Davion while Mother was gone on January 21. M.C. further testified: "[T]hat was the only time I ever saw [Mother] leave the baby was that day she went with her mom. I mean, she was always there any other time."

Regardless of whether Davion was left in the care of D.B. for a short time during the day on January 21, 2011, Dr. Perales opined that to a reasonable degree of medical certainty, she believed Davion was injured when he became symptomatic, which Dr. Perales identified as when Mother said Davion "shivered," threw his head back with his eyes rolling back in his head, and became limp at approximately 2:00 a.m. on January 22. Mother's testimony places this occurrence as transpiring when she was alone in her room with the Children. Mother, D.B., and M.C. all testified that Mother placed Davion on the floor and went to D.B.'s room to wake her. It is undisputed that no one subsequently picked up Davion until at least when Mother returned with D.B. Davion was already symptomatic by that time.

Also significant was M.C.'s testimony that she heard Davion cry at the time Mother awoke with him, which M.C. described as "in the middle of the night" on January 21, 2011. M.C. explained that she then heard the crying suddenly stop. Mother argues that the crying stopped because Davion went limp, not because Mother harmed Davion. M.C. further testified, upon review of a transcript of her interview with Detective Damewood, that she had once heard Mother threaten to slam the baby against a wall if he did not stop crying.

The trial court stated it believed the cessation of crying coincided with when Davion became symptomatic and with when he was injured by Mother. This was not, however, the basis for the trial court's ruling that Mother had committed severe abuse. Instead, the court found Dr. Perales credible in her expert opinion that the injury was inflicted and that it

occurred when Davion became symptomatic. It is undisputed that Davion had been exclusively in Mother's care for many hours before he became symptomatic.

To further support her position, Mother relies in part on *State of Tenn. Dep't of Children's Servs. v. H.A.C.*, No. M2008-01741-COA-R3-JV, 2009 WL 837709 at *4 (Tenn. Ct. App. Mar. 26, 2009), for the proposition that evidence of a mere possibility that a parent severely injured her child, coupled with the parent's dubious explanations for the injury, are insufficient to find clear and convincing evidence of severe child abuse. In *H.A.C.*, however, the child's father had inflicted the injury, and this Court, determining there was insufficient evidence to support a finding that the mother knowingly allowed the father to harm the child, reversed the finding of severe abuse against the mother only. *Id.* Similarly, in *In re Dakota C.R.*, No. W2010-01946-COA-R3-JV, 2012 WL 1418048 at *11 (Tenn. Ct. App. Apr. 24, 2012), also cited by Mother for essentially the same proposition, this Court determined there was insufficient evidence to find the father guilty of severe child abuse where there was no evidence presented to support that he knew the mother was capable of abusing the children. Mother's reliance on these cases is unavailing, as the trial court found that Davion was in her sole care at the time of the injury.

We conclude that the evidence does not preponderate against the trial court's determination by clear and convincing evidence that Mother committed severe child abuse. The trial court did not err in terminating Mother's parental rights based upon this ground.

## V. Best Interest of Children

When a parent has been found to be unfit by establishment of a ground for termination, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee Code Annotated § 36-1-113(i) (2010) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878. Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

-12-

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances[3] as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

---

[3]Effective July 2012, after the filing of the petition in the instant case, The Tennessee General Assembly amended Tennessee Code Annotated § 36-1-113(i)(7) to substitute "alcohol, controlled substances or controlled substance analogues" in place of "alcohol and controlled substances." *See* 2012 Pub. Acts ch. 848, § 8.

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As the State concedes in its brief on appeal, analysis of whether it was in the Children's best interest to terminate Mother's parental rights presented a "close" call. Having found by clear and convincing evidence that Mother committed severe child abuse by inflicting Davion's head injury and recognizing Mother's positive efforts to maintain a relationship with the Children through visitation and support, the trial court stated the following in its oral ruling from the bench:

I have it a very close call. And [Mother's counsel] said that we have to take chances, we have to take risks, but I can't take this kind of risk. I can't take the risk that there wouldn't be another fit, I can't risk that things will be going as good in the future for [Mother] as they are now.

In its decree, the trial court made the following factual findings regarding the statutory factors listed in Tennessee Code Annotated § 36-1-113(i):

1.  The mother has not made any significant adjustment in her circumstances since the children came into the custody of the Department of Children's Services so as to make the children safe in her home. Mother has not addressed her own issues so that she can attend to the needs of the children. Mother has not acknowledged her role in causing the injury to Davion, and absent that she cannot prove any adjustment in her circumstances to make it safe to place her children with her.

2.  Mother has not effected any significant adjustment, much less a lasting adjustment after appropriate and timely services put in place by the Department of Children's Services to address the mother's parenting. Mother lost control and injured her child. She has not cooperated with mental health services to attempt to address the issues which led to her loss of control and [to] try to ensure that such loss of control does not happen again. Given the time these children have been in custody and the time devoted to attempting to resolve the various family issues, it does not reasonably appear that such an adjustment is possible.

3. Mother has continued to visit the children with regularity and respond to their needs during visits, and appears to love her children.

4. Mother clearly has a meaningful relationship with these children.

5. Changing caretakers at this point, after about one-half of Travion's life and nearly all of Davion's life would be detrimental to the children's emotional, psychological and medical conditions, especially Davion.

6. Based on the Court's finding that [Mother] severely abuse[d] Davion [B.], factor 6 weighs against [Mother].

7. Although the mother's home is physically safe for the children, the Court's concern is mother's continued drug use during the time that she had these children, up to the day before the incident in question. Of further concern is [Mother's] attempts to have [D.B.] lie to DCS and law enforcement regarding [Mother's] drug usage.

8. Mother's emotional/mental status weighs against the mother as she failed to meaningfully participate in counseling, even to address the trauma associated with losing children to the custody of the Department of Children's Services. Her prognosis for change is poor given her resistance to any sort of disclosure during counseling. Mr. Ownby's testimony makes clear that [Mother] continues to minimize her involvement in causing Davion's injuries and continues to deny responsibility. Her emotional/mental inability to acknowledge her role in causing the injuries prevents her from making progress to provide a safe home for the children.

9. Mother has paid support for these children while in the custody of the Department of Children's Services.

10. Ending the parent-child relationship will benefit the children as they will now be able to move on with their lives knowing that

their mother will not be in their lives and they can unreservedly attach to appropriate [sic].

The trial court therefore concluded that it was in the Children's best interest to terminate Mother's parental rights. Upon our careful review of the entire record, we agree.

Mother had a history of investigation and monitoring by DCS for marijuana use during both pregnancies, although she completed outpatient treatment during her second pregnancy. When Ms. Fox, who testified at the trial, and Detective Damewood went to D.B.'s apartment after Davion was hospitalized on January 22, 2011, they found a baggie of marijuana on top of the dresser in Mother's bedroom. Mother admitted that she smoked marijuana in the early evening of January 21, 2011. She denied, however, that the marijuana found in her room belonged to her, insisting it was not on the dresser when she was last in the apartment. Mother admitted missing an appointment with investigators to take a drug screen shortly after Davion's hospital admission. She refused to take a drug screen when present at court for the preliminary hearing on January 26, 2011. It was undisputed that after January 2011, Mother consistently submitted to drug screens required by DCS and consistently tested negative for illegal substances.

Mother acknowledged that she had reviewed transcripts of two telephone calls made by D.B. to Mother without Mother realizing that investigators were recording the communications. In one conversation, Mother addressed the presence of drugs by telling D.B.: "You don't know where it came from, you don't know whose it is, and you've just never seen it before. Just please say you don't know whose it is, you don't know where it came from, you don't think I smoke, please."

Mother explained that when she began residing with D.B., she had intended a temporary arrangement while she awaited availability of an apartment of her own. On the day the Children were removed from her custody, she signed a lease for an apartment. She had been living in that apartment ever since. Mother reported that she began employment with Taco Bell in July 2011. By the time of trial, she was working forty to fifty hours a week for a wage of $7.70 an hour. This wage rate represented one pay raise, and she had been told she would receive a promotion soon. She indicated that approximately fifty percent of her paychecks went to pay child support.

Mother further testified that since placement in DCS custody, Travion had been attending speech therapy appointments, which she regularly arranged her work schedule to attend. Although Mother initially visited with her children weekly, the visitation later averaged once every two weeks as DCS reduced the number of visits. Mother established

a room for the Children in her apartment, which space included two beds, a dresser, a television, and "a lot of toys."

Emily Heird testified that she worked as a mental health therapist at Solution Source and that Mother was referred to her by DCS for counseling regarding the issues surrounding the Children's removal. Mother met with her four times in 2011 on June 15, June 28, September 27, and November 14. The therapist reported that after the June sessions, she gave Mother "some space" because a court hearing was approaching and Mother wanted to wait for more counseling until she knew the status of her case. Mother, however, did not contact Ms. Heird again until Ms. Heird sent Mother a letter on August 22, indicating that she would have to close the case if she did not hear from Mother within two weeks. Mother then called Ms. Heird and scheduled the September 27 appointment. Ms. Heird stated that Mother failed to call or appear for two scheduled appointments in October. She also cancelled an appointment scheduled for November 1. Mother kept her November 14 appointment, but by the end of November 2011, Ms. Heird discharged Mother from counseling as unsuccessful when Mother's insurance terminated coverage. Ms. Heird stressed that she would have been willing to work with Mother to continue counseling if Mother had made an effort to do so.

Ms. Heird explained that she was unsuccessful in addressing issues in any depth with Mother inasmuch as Mother was guarded, reserved, and could not identify goals she wanted to pursue in counseling. Ms. Heird opined that Mother made appointments to "appear compliant with DCS requirements." Mother became more talkative and open in later sessions, but Ms. Heird said Mother did not address the trauma of having the Children removed from her custody.

Ms. Foster testified that she is Mother's aunt and the Children's great aunt. The Children were placed in her home as a kinship foster placement at the time DCS removed them from Mother's custody. They had resided continuously in her home since that time. Those living in her home also included her husband and their eleven-year-old daughter. While Ms. Foster was at work during the week, her mother cared for the children in the Fosters' home. She said that both Children were healthy at the time of trial and that Davion had been released from the care of his neurologist. She reported that when the Children first came into her home, Davion was small for his age and experienced difficulty sitting up. He also suffered from acid reflux and projectile vomiting. As Davion developed the ability to accept various foods, these problems were resolved. By the time of trial, he was on target for his age and enjoyed a healthy appetite.

Ms. Foster further testified that in addition to Mother's supervised visitation with the Children, Mother kept in touch with the Children via telephone calls and text messages sent

to Ms. Foster and her husband. She noted that both Children recognized Mother's photograph on Ms. Foster's phone when Mother would call. They enjoyed talking to Mother. She felt that the Children had grown to love her family and that Davion was "definitely attached" to them. She opined that Travion remembered living with his mother and had a greater connection to Mother.

Ms. Foster further explained that everyone in her immediate family enjoyed having the Children in the home and that it had become "natural" to have the Children reside there. When asked if she and her husband desired to adopt the Children if they became available for adoption, Ms. Foster answered, "Absolutely." She asserted that if she and her Husband adopted the Children, it would be best for the Children to maintain some contact with Mother.

The Children's maternal grandmother ("Grandmother") testified that Mother and the Children lived with her from November 2010 through part of January 2011 before Mother moved in with D.B. Grandmother said that at the time of trial, Mother had a two-bedroom apartment arranged as though the Children were present all the time. The home was stocked with toys, diapers, and clothing for the Children. Grandmother, present during several visits between Mother and the Children at Mother's house, described a typical visit:

> [T]he boys come in and they act like they're home. They take off their shoes, she feeds them, she plays with them, she teaches them things. I've seen her correct them or set them in time-out, and she'll explain to them if they're doing something they're not supposed to do. They're very, very attached to their mother.

Grandmother denied ever having observed Mother roughly discipline the Children or having heard Mother threaten to hurt the Children in any way.

Carlos R. Ownby testified that he was the Pastor at Bakertown Ministries, which assisted residents of subsidized housing. He had known Mother since she moved into Bakertown Ministries in January 2011. After Mother had been at Bakertown for about two months, she began assisting with the ministry by helping to prepare food, clean up, and care for children. Pastor Ownby said he was impressed with Mother's maturity and was glad to have her help in chaperoning twenty-three children at a vacation Bible school. He observed Mother during two visits with the Children at Mother's apartment and indicated he noticed a close, loving bond between Mother and the Children.

Pastor Ownby also testified that Mother told him the Children were removed because of an accident when Travion pulled Davion off the couch. He said he understood that "there

was some question as to whether the Department of Children's Services felt like she took the appropriate action at the appropriate time." When asked if he would still have confidence in allowing Mother unsupervised access to children in his ministry if he were to learn that the court found Mother to have committed severe child abuse, Pastor Ownby said he would. He had observed no indication that Mother was using drugs while assisting in his ministry.

Jessica Hume testified that she was the DCS case manager for the Children until accepting a different position. She remembered speaking with Mother in July 2011 concerning a possible trial home placement. As explained by Ms. Hume, the "lingering issue" preventing trial home placement was that Mother did not successfully complete individual therapy. Ms. Hume supervised visits between Mother and the Children first at the DCS office and then at Mother's apartment. She said Mother regularly attended the visits and provided appropriate snacks and activities. She noted that the Children appeared happy with Mother and that Travion would run to greet Mother upon arrival. Ms. Hume reported personally administering drug screens to Mother "a good handful of times," with Mother never failing the screens.

Leigh Anne Goldstine testified that she was a clinical therapist with Foothills Care, Inc., which office received a referral to provide therapeutic visitation for Mother and the Children. According to a court report she had prepared, dated November 9, 2011, Mother and the Children visited twenty-five times between when the case was opened on April 15, 2011, and the date of the court report. Mother began with sixteen visitation hours a month. This was subsequently decreased to ten hours monthly, followed by six hours a month at DCS's direction. Ms. Goldstine said that the visits were positive experiences, with the Children eager to see Mother. Mother was always prompt and was well prepared with many snacks and activities. She said Mother created a regular routine without being prompted. Mother disciplined appropriately by redirecting attention and using "time out" when needed. Ms. Goldstein did not perform a formal bonding assessment. She indicated this was because she felt it evident from the beginning that Mother and the Children were bonded.

At the close of the trial, Stacy Eckard, the guardian *ad litem* appointed by the trial court ("GAL"), opined that she believed termination of Mother's parental rights was in the best interest of the Children. The GAL explained that she had been involved with the Children before their coming into protective custody, first as Travion's GAL and then as the GAL for both Children. The GAL agreed with witnesses who testified that Mother was appropriate with and attentive to the Children and that Mother believed it her responsibility to care for them. The GAL was convinced, however, that the State had met its burden of showing severe child abuse and that Mother had failed to make any adjustment to ensure that no such incident would happen again. Of concern was Mother's failure to address her own mental and emotional state in therapy. The GAL expressed additional concern regarding

-19-

Mother's past marijuana use. She noted that the Children's pre-adoptive home was with relatives who had stated their intention of maintaining a relationship between Mother and the Children.

We note, as did the trial court, that some factors weigh in favor of maintaining Mother's parental relationship with the Children. Several witnesses for Mother, including the Children's maternal grandmother, a prior DCS case manager, and a therapist who provided therapeutic visits between Mother and the Children, testified that Mother and the Children enjoyed a strong parent-child bond. Mother furthered this relationship after the Children were removed from her custody by being attentive and well prepared during visitation. Mother also maintained appropriate housing and employment, enabling her to pay child support, which she did.

The factors weighing against Mother and in favor of terminating her parental rights, however, pose an overriding concern that the Children would not be safe in Mother's future care. The circumstance causing the Children to be removed from Mother's custody was the traumatic injury to Davion, which we have concluded the trial court properly found to be the result of severe child abuse by Mother. By failing to address both her role in causing Davion's injury and any underlying mental or emotional issues that caused her to resort, even in a moment of frustration, to injuring her child, Mother has failed to show significant and lasting adjustment in her circumstances that would ensure the safety of the Children. Although Mother demonstrated that she consistently tested negative for drug use after the preliminary hearing, her history of marijuana use when pregnant, admitted marijuana use hours before Davion's January 2011 hospitalization, and attempt to persuade D.B. to lie about such use all weigh against her ability to provide a safe environment for the Children as well. The State presented undisputed testimony that the Children were healthy, happy, and well adjusted in their kinship foster home. Ms. Foster testified that she and her husband wished to adopt the Children. As the trial court determined, changing caretakers at this point in the Children's lives, after having lived with the Fosters since ages sixteen months and six months, respectively, would be detrimental to their emotional, psychological, and medical conditions.

On appeal, Mother relies on *In re D.P.M., S.H., & Y.M.P.*, No. M2005-02183-COA-R3-PT, 2006 WL 2589938 at *12-14 (Tenn. Ct. App. Sept. 8, 2006), to support her position that termination of a mother's parental rights due to a finding of severe abuse is inconsistent with the children's best interests where a close bond exists between the mother and children. In *In re D.P.M*, this Court considered, in addition to the close bond between the mother and child, the child's therapist's opinion that the child's connection to her nuclear family was of utmost importance to the child. *Id.*; *see also In re D.P.M., S.H., & Y.M.*, No. M2007-02741-COA-R3-PT, 2008 WL 4693725 (Tenn. Ct. App. Oct. 23, 2008) (affirming the trial court's

second ruling terminating the mother's parental rights as in the best interest of the children). We do not find Mother's reliance on *In re D.P.M.* (2006) to be persuasive when applied to the facts of the case at bar.

We conclude that the evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that terminating Mother's parental rights was in the best interest of the Children.

## VI. Conclusion

The judgment of the trial court terminating the parental rights of Mother is affirmed. Costs on appeal are taxed to the appellant, Samantha B. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE